IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERTA F. SMITH, | ) | 8:05CV524 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, the plaintiff, Roberta Smith, contends that an administrative law judge erred by failing to develop the administrative record regarding her complaints of anxiety, depression, migraine headaches, and possible fibromyalgia. I will affirm the ALJ's determination that Smith is not disabled.

## *I.  BACKGROUND*

Smith applied for disability insurance benefits and supplemental security income on March 10, 2004, alleging that she had become disabled on September 15, 1998, when she was 42 years old, due to neck pain, back pain, left shoulder pain, carpal tunnel syndrome, and headaches. She was found "not disabled" on August 3, 2004, and that finding was reaffirmed on October 22, 2004, after reconsideration.

At Smith's request, an administrative hearing was held on March 1, 2005. Testimony was provided by Smith, who was represented by counsel, and by a vocational expert under contract with the agency. The ALJ's adverse decision was issued on May 6, 2005.

On September 22, 2005, the Appeals Council denied Smith's request for further review. This action was timely filed on November 23, 2005.

### A.  Findings by the ALJ

The ALJ evaluated Smith's claims according to the five-step sequential analysis prescribed by the social security regulations. See 20 C.F.R. §§ 404.1520 and 416.920. Among other things, she found (1) that Smith had not engaged in any substantial gainful activity since September 15, 1998; (2) that Smith has a medically determinable impairment consisting of mild acromioclavicular degenerative joint disease of the left shoulder; (3) that while this impairment is "severe" under the regulations, it does not meet or equal those impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) that Smith retains the residual functional capacity to return to her past relevant work as a telemarketer and cleaner; and (5) that Smith can also perform other jobs involving unskilled, sedentary and light work activity that exist in significant numbers in the regional economy.

### B.  Issue on Appeal

Smith requests that the Commissioner's decision be reversed and the case remanded for further proceedings because the ALJ allegedly failed in her duty to develop the record.

### II.  DISCUSSION

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. Id., at 960-61; Prosch v. Apfel, 201 F.3d 1010, 1012

(8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. See Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Boock v. Shalala, 48 F.3d 348, 351 n.2 (8th Cir. 1995); Smith, 982 F.2d at 311.

### A. *The ALJ's Duty to Develop the Record*

Social security hearings are non-adversarial, and it is well-established that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press her case. See Snead v. Barnhart 360 F.3d 834, 838 (8th Cir. 2004). However, reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); Shannon v. Charter, 54 F.3d 484, 488 (8th Cir. 1995). The burden of persuasion to prove disability and to demonstrate residual functional capacity (RFC) remains on the claimant, even when the burden of production shifts to the Commissioner at step five. Eichelberger v. Barnhart, 390 F.3d 584, 592 (8th Cir. 2004); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

The ALJ's duty includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004). It may also include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped. Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). In this regard, the Commissioner's regulations explain that

contacting a treating physician is necessary only if the doctor's records are "inadequate for us to determine whether [the claimant is] disabled" such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e), 416.912(e).

### *B. Medical Evidence*

Smith's medical record is sparse. In fact, the only records that pre-date her application for social security benefits are treatment notes dictated by John Gill, M.D., who saw Smith twice in late 2001, and treatment notes dictated by Brad Vasa, M.D., who saw Smith for the first time in February 2004.

The first office visit to Dr. Gill, on September 18, 2001, was for a routine pap smear and pelvic exam. During that visit, Smith stated that she had been under a significant amount of stress recently, following the death of her husband, and that she was taking her husband's leftover Xanax to help her sleep. Dr. Gill gave her a 1-month supply of Xanax and also offered an antidepressant, which Smith declined. (Tr. 161.) Smith returned to Dr. Gill's office on October 8, 2001, concerned that she might be pregnant; she tested negative. Nothing else appears to have been discussed, nor does it appear that Smith ever saw Dr. Gill again.[1] (Tr. 160.)

---

[1] Although there is a third entry in Dr. Gill's records that bears both a rubber-stamped date of November 5, 2001, and a typed date of December 5, 2001, this appears to be for a different patient with the same name as the claimant. This third entry is for a follow-up visit that does not correspond to either of Smith's previous visits, the identifying number (#2430) typed after "Roberta Smith" is different from that used on the first two visits (#2008), and Dr. Gill's initials do not appear on the entry, which instead is shown to have been dictated by "DSF." (Tr. 159-160.) There is also a "wrong chart" notation for December 12, 2001, which suggests that the patient records were mixed up on another occasion. (Tr. 159.) The ALJ references

4

On February 27, 2004, Smith presented herself to Dr. Vasa at the Physicians Clinic in Nebraska City, complaining of "persistent left shoulder and neck pain" that "[h]as been going on for the last 15 years." (Tr. 190.) She reported that her left upper extremity is constantly numb, and related this to an injury 6 years ago that made her symptoms a lot worse. Dr. Vasa started Smith on muscle relaxants and recommended physical therapy. (Tr. 190.) After having filed her application for social security benefits, Smith returned to the clinic on March 31, 2004, complaining of a "burning type pain between her scapula area and her neck that has been going on about the last 4 to 6 weeks," and also of "long standing headaches secondary to an accident a few years ago." (Tr. 189.) Dr. Vasa gave Smith some Bextra samples, wrote a prescription for Flexeril, and talked to her about physical therapy and seeing a specialist. (Tr. 189.) Smith called about a week later, requesting a prescription to help her sleep and stating that she had been on Xanax; Dr. Vasa prescribed Remeron instead. (Tr. 189.)

The agency ordered x-rays of Smith's cervical spine and left shoulder, which were taken on July 9, 2004. The cervical spine series was normal, and the left shoulder series only showed mild AC joint degenerative changes. (Tr. 162.) The agency also ordered an examination by Michael L. Zaruba, M.D.[2] Smith reported that she had been experiencing bilateral shoulder and neck pain for two years, since being dragged by a car, and that she had numbness and tingling in both extremities. Dr. Zaruba also noted a history of chronic anxiety. (Tr. 164.)

---

the November 5 or December 5, 2001 entry in her decision (Tr. 13), and it is also discussed in the parties' briefs (Filing 18 at 3; Filing 19 at 2). Even though I think it is wrong to assume that this entry pertains to the claimant, I find no reversible error in the ALJ making such an assumption, or, for that matter, in the ALJ then not attributing any significance to the entry. By the same token, I find that the entry is not significant enough to require clarification of the record.

[2] The date of this examination is not shown, but Dr. Zaruba's report was transcribed on July 14, 2004.

5

On July 14, 2004, Smith was seen at the Physicians Clinic by Samantha A. Barnhart, P.A. Smith reported that she had fallen down 5 stairs the previous night, aggravating the pain in her neck and left shoulder. X-rays were taken of the left shoulder, cervical spine, and thoracic spine, and no acute abnormalities were seen. Smith was told to continue with the Bextra as prescribed by Dr. Vasa, and she was also given a prescription for Vicodin. (Tr. 186-187.) Smith stated that "[s]he also takes Xanax prn for anxiety." (Tr. 187.) Smith had a follow-up appointment with Dr. Vasa on July 23, 2004, during which she complained of a headache and stated that "she had been diagnosed with migraine headaches in the past." (Tr. 185-186.) Dr. Vasa noted that Smith appeared "in mild distress" and he gave her samples of Imitrex for the headache. (Tr. 185.)

A physical RFC assessment was completed on July 30, 2004, by an agency consulting physician, A. R. Hohensee, M.D., who opined that Smith's statements in her March 15, 2004 daily activities and symptoms report (Tr. 106-110) were only partially credible. Dr. Hohensee noted that although Smith complained of daily, chronic headaches, her first mention of this in the medical reports was on July 23, 2004, and that even then she only reported a past diagnosis of migraines. (Tr. 153.) This is not accurate, because Smith told Dr. Vasa on March 31, 2004, she had "long standing headaches." (Tr. 189.) Dr. Hohensee also noted that there was no objective evidence to support Smith's complaints of severe neck and shoulder pain, but that she does have mild degenerative joint disease in her left shoulder and carpal tunnel syndrome (CTS) symptoms in her right hand that impose some restrictions. (Tr. 153.) No mention was made of Smith's reports of anxiety.

Smith's Vicodin prescription was refilled on August 5, 2004. (Tr. 185.) When she saw Dr. Vasa again on August 12, 2004, Smith reported that the Imitrex "seemed to help some" with her headaches, but she was "[s]till complaining of muscle spasms in her neck." (Tr. 184.) Dr. Vasa gave her Flexeril. Smith returned on August 27, 2004, "for clarification of her Xanax prescription." Dr. Vasa "spoke to her at length about how this is a controlled substance," but authorized the prescription. (Tr. 184.)

Dr. Vasa also referred Smith to Robert A. Vande Guchte, M.D., a spinal surgeon, who performed a comprehensive examination on September 1, 2004. (Tr. 173-185.) Smith complained of "a multitude of areas of pain including the neck, bilateral shoulder areas and her lower back region with some mild radicular type pain pattern extending into the legs." (Tr. 179.) Dr. Vande Guchte could not identify any cause for the pain, but he administered a cortisone injection in Smith's left shoulder that helped somewhat, and he prescribed physical therapy. He also recommended MRI studies but noted that Smith had "some concerns about pursuing further investigations at this stage." (Tr. 180.) Smith's neurologic and psychiatric assessments were both completely normal. (Tr. 176.) Even so, Dr. Vande Guchte noted that:

> There were some concerning features in regards to the patient's clinical evaluation today. One of the concerns that we did see was on the patient's self assessment form. A very high level of anxiety and high level of depression is noted. The patient also notes emotional upset with social, financial and work environment situations. Obviously all of these factors play into the chronic symptoms that the patient has been having. On clinical exam, there were also features of non-organic findings which made some of the objective findings of the clinical exam suspect. I think the patient could certainly benefit from a multi-disciplinary approach to her back pain and neck pain issues. One of the main components of this is to evaluate the patient as a whole and utilizing the treatment modalities that a psychologist can provide to the patient as well as the pain consultants in an effort to determine a pain management program.

(Tr. 178.)

On November 18, 2004, Smith consulted Eric W. Pierson, M.D., a neurological and spinal surgeon, regarding "neck pain and intermittent bilateral hand numbness." (Tr. 203.) Dr. Pierson reviewed a cervical MRI that was negative. He also noted that 2 days earlier Smith had cervical x-rays taken at the Bryan East Hospital emergency room, which were also negative. (Tr. 203.) Dr. Pierson was "not sure what to make

of her left shoulder." He did not think there was anything serious, but noted that Smith "certainly tries to avoid moving it." (Tr. 203.) At Smith's request, Dr. Pierson made arrangements for her to be seen by Patrick Hurlbut, M.D., an orthopedic surgeon, who examined her left shoulder on November 30, 2004. Dr. Hurlbut thought that Smith's pain was "secondary to muscular strain involving the periscapular muscles with associated snapping scapula." (Tr. 205.) Smith told Dr. Pierson that she had "carpal tunnel release by Doctor Miller several years ago." (Tr. 203.) Because Dr. Pierson thought Smith might have recurrent carpal tunnel syndrome on the left, he also referred her to James A. Bobenhouse, M.D., a neurologist. (Tr. 203.)

Dr. Bobenhouse found no evidence of carpal tunnel syndrome when he examined Smith and performed tests on December 5, 2004. (Tr. 201.) During the course of the examination, Smith stated that "she has experienced frequent pressure type headaches over the frontal and temporal regions with associated photophobia, hyperacusis, but no nausea, vomiting or vision disturbance." (Tr. 198.) No mention was made of anxiety or depression, but Smith noted "problems with forgetfulness." (Tr. 198.) Dr. Bobenhouse's impressions were: (1) "Chronic neck and shoulder pain with arm paresthesias, secondary to cervical strain and muscle spasm associated with bilateral thoracic outlet syndrome." (2) "Muscle contraction/vascular headaches." He prescribed Neurontin and physical therapy for the neck and shoulders, and recommended thoracic outlet syndrome exercises. (Tr. 199.)

### 1. *Mental Impairments*

Smith's attorney states that "[a]lthough we know she 'finished' the 10th grade nothing further regarding her intellectual functioning is contained in the record." (Filing 18 at 8.) Actually, Smith testified that she is of average intelligence (Tr. 222), and her testimony bears this out. The medical records do not indicate any problems with Smith's intellectual functioning apart from one complaint of forgetfulness. In fact, Dr. Vande Guchte observed that Smith's orientation, judgment and insight,

8

memory, attention span and concentration, mood and affect, language, and fund of knowledge were all normal. (Tr. 176.)

Dr. Vande Guchte was concerned by Smith's responses on her self-assessment form, which is not contained in the medical records, and thought that she would benefit from "a multi-disciplinary approach to her back pain and neck pain issues" that would include the services of a psychologist. (Tr. 178, 195-196.) This may be good advice, but "the ALJ is under no duty to provide continuing medical treatment for the claimant." Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003).

Smith did not allege that she was disabled because of anxiety and depression. As stated in the initial denial of her application, Smith claimed that she was unable to work due to "neck pain, back pain, left shoulder pain, carpal tunnel syndrome and headaches." (Tr. 42.) Her request for reconsideration, which was also signed by her former attorney, cited only "extreme pain and numbness." (Tr. 46.) At the outset of the administrative hearing the ALJ specifically inquired whether Smith's former attorney thought the file was "complete and ready for decision," and he replied affirmatively. (Tr. 217.)

Although the medical records show that Smith reported anxiety, it appears that she only took Xanax as needed to help her sleep. The medical records do not reflect that she was diagnosed with depression, but Smith testified that she was taking an anti-depressant (Tr. 229), which was identified in her answers to interrogatories as amitriptyline. (Tr. 140.) In response to questioning from her attorney, however, Smith denied that she was depressed. (Tr. 236.)

The ALJ specifically found that "the evidence does not indicate that the Claimant's depression has significantly limited her ability to perform basic work activities and thus has not constituted a 'severe' impairment as defined in the Regulations." (Tr. 21.) The ALJ noted in this regard that "the Claimant denied having depression at the hearing, and it does not appear that she has been under any

9

active treatment with mental health practitioners." (Tr. 21.) The ALJ did not make a specific finding regarding Smith's anxiety.

Smith's attorney argues that the ALJ should have ordered a psychological evaluation, but the caselaw does not support this contention. See, e.g., Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) (fact that claimant has been prescribed antidepressants on at least one occasion is not enough to require ALJ to inquire further into the condition by ordering a psychological evaluation); Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir.1993) (ALJ properly found that insufficient evidence had been introduced to show that claimant suffered from significant mental disturbances; ALJ had no obligation to investigate claim that was not presented at the time of the application for benefits and not offered at the hearing as a basis for disability); Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir.1989) (where claimant did not allege disability due to mental impairment and presented only minimal evidence of anxiety, ALJ did not err when he failed to order consultative examination before concluding claimant had no mental impairment). The ALJ's determination that Smith does not have a severe mental impairment is supported by substantial evidence on the record as a whole, without the need for a psychological evaluation.

## 2. *Migraine Headaches*

Smith's attorney also argues that the ALJ was obligated to develop the record regarding Smith's documented complaints of migraine headaches, but he does not explain in what respect the record is deficient. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. Haley v. Massanari, 258 F.3d 742, 749-50 (8th Cir. 2001) (finding there was substantial evidence in the record to allow the ALJ to make an informed decision, including medical reports from treating and consulting physicians, disability reports and questionnaires completed by complaint, and hearing testimony by claimant). I again find that the record was sufficiently developed as to this condition.

### *3. Fibromyalgia*

Finally, Smith's attorney represents that "a chart note generated by Dean R. Thomson, M.D., one of the doctors at the Nebraska City Medical Clinic with Dr. Vasa, from April 19, 2006 has appeared." (Filing 18 at 9.) "In it he says 'I had a long visit with Roberta today about her **fibromyalgia** [!]. . . . She has numerous symptoms that were well-documented in previous dictation, and in the old records that are part of the chart.'" (Id.) (bold type, bracketed punctuation, and ellipsis in original). Suffice it to say that the ALJ was not required to anticipate this possible diagnosis.³ See Stormo, 377 F.3d at 806 (ALJ was not duty-bound to develop the record by asking treating physicians for more information where no crucial issue was undeveloped).

### *III. CONCLUSION*

For the reasons stated, I find that the Commissioner's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed.

August 25, 2006.    BY THE COURT:

*s/ Richard G. Kopf*
United States District Judge

---

³ Fibromyalgia is a chronic condition, usually diagnosed after eliminating other conditions, and no confirming diagnostic tests exist. See Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005).